UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 05-cr-146-pp

v.

ORLANDES NICOLE NICKSION,

Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR A REDUCED SENTENCE UNDER THE FIRST STEP ACT OF 2018 (DKT. NO. 846), DENYING AS MOOT DEFENDANT'S MOTION FOR STATUS UPDATE (DKT. NO. 857), DENYING AS MOOT DEFENDANT'S MOTION TO COMPEL PROMPT RULING AND ENFORCE CONTROLLING LAW UNDER THE FIRST STEP ACT, WITH NOTICE OF DUE PROCESS VIOLATION (DKT. NO. 859) AND DENYING AS MOOT DEFENDANT'S SECOND MOTION TO COMPEL PROMPT RULING AND ENFORCE CONTROLLING LAW UNDER THE FIRST STEP ACT, WITH NOTICE OF DUE PROCESS VIOLATION (DKT. NO. 860)**

---

On February 24, 2024, the defendant filed a "Motion for Sentence Reduction Pursuant to § 404 of the First Step Act." Dkt. No. 846. The defendant contends that he is eligible for a sentence reduction under the First Step Act of 2018 because the Fair Sentencing Act of 2010 changed the statutory mandatory minimum sentence for his conviction for conspiracy to possess with intent to distribute and to distribute crack cocaine. Id. at 1. The defendant argues that he deserves a sentence reduction because the district court applied an incorrect sentencing guideline, because his 480-month sentence created a disparity with other similarly situated individuals and

because of his age and rehabilitation efforts. Id. at 3-11. Both the government and the probation office oppose any sentence reduction. Dkt. Nos. 848, 849.

In 2020, the court ruled on similar motions from the defendant's co-conspirators Mark Cubie (Dkt. No. 831) and Ronald Terry (Dkt. No. 842). The court granted Cubie's motion and denied Terry's motion. The court received the defendant's motion four years after those of his co-conspirators. The court regrets its delay in addressing the defendant's motion and understands why he has filed additional motions requesting a ruling. See Dkt. Nos. 857 (motion for status update); Dkt. No. 859 (motion to compel prompt ruling and enforce controlling law under the First Step Act, with notice of due process violation); and Dkt. No. 860 (second motion to compel prompt ruling and enforce controlling law under the First Step Act, with notice of due process violation).

Although the defendant is eligible for a reduction under the First Step Act, the court will not exercise its discretion to reduce his sentence.

## I. Procedural and Factual Background

### A. Pretrial Proceedings

The defendant was arrested on a criminal complaint on May 17, 2005, dkt. no. 2; about three weeks later, on June 7, 2005, the grand jury charged the defendant and six others in a seven-count indictment, dkt. no. 37. Count One alleged that beginning sometime in 2004 and continuing through May 2005, all the defendants conspired to possess with intent to distribute and to distribute five kilograms or more of cocaine and fifty grams or more of crack cocaine in violation of 21 U.S.C. §§841(a)(1) & 846. Id. at 1-3. The other count

pertaining to the defendant was Count Seven, which accused him of being a prohibited person in possession of a firearm. Id. at 9. On July 19, 2005, the grand jury returned a superseding indictment which added a co-defendant but did not change any of the charges against the defendant. Dkt. No. 81. At the time of both the original and the superseding indictment, 21 U.S.C. §841(b) prescribed a mandatory minimum sentence of ten years for anyone convicted of a conspiracy involving five kilograms or more of powder cocaine or fifty grams or more of cocaine base/crack. The case eventually was assigned to Judge Charles N. Clevert, Jr.

During pretrial litigation, the defendant moved to exclude Title III wiretap evidence, to sever his case from that of his co-defendants and to suppress search warrant evidence. Dkt. No. 117. The court denied those motions and overruled the defendant's objection. Dkt. Nos. 209, 235. On August 22, 2006, shortly before the scheduled final pretrial conference, the grand jury returned a second superseding indictment. Dkt. No. 259. The second superseding indictment added one defendant and dropped another, but again, the charges against the defendant remained the same. Id.

On September 18, 2007, after an extensive round of pretrial motions and trial preparation, see generally dkt. nos. 311, 338, 341, 342, 343, 351, 355, 416, the grand jury returned a third superseding indictment, dkt. no. 419. The third superseding indictment revised the start date of the conspiracy alleged in Count One, alleging that the conspiracy began "sometime in 2002," rather than in 2004 as prior iterations of the indictment had alleged. Id. at 1. It alleged that

the conspiracy involved five kilograms or more of a mixture and substance containing cocaine and fifty grams or more of a mixture or substance containing cocaine base/crack, as well as marijuana. Id. at 2. The third superseding indictment also added a new charge: Count Two, alleging that on September 19, 2002, the defendant, Ronald Q. Terry and Mark Cubie knowingly discharged a gun during and in relation to the drug conspiracy. Id. at 4. In total, the third superseding indictment—the operative indictment against the defendant—charged the defendant in Count One (the drug conspiracy), Count Two (the September 2002 discharge of a firearm) and Count Nine (prohibited person in possession of a firearm). Id. The statutory mandatory minimums remained the same.

On October 29, 2007, the date scheduled for the first day of the jury trial, an executed plea agreement was filed. Dkt. No. 467. The agreement provided that the defendant had agreed to plead guilty to the conspiracy charge, id. at 2-3, which the plea agreement described as "[b]eginning in sometime in 2004 and continuing through May 16, 2005," id. at 2. The same day—October 29, 2007—the defendant and his counsel appeared before Judge Clevert and the defendant entered his guilty plea.[1] Dkt. No. 473.

---

[1] Co-defendants Terry and Cubie also filed plea agreements on October 29, 2007, dkt. nos. 466, 469, and pled guilty that day. Terry agreed to plead guilty to the conspiracy count. Dkt. No. 466. Cubie pled guilty to the conspiracy count and one count of carrying a firearm during and in relation to a drug trafficking offense that occurred on February 2, 2005. Dkt. No. 469.

Judge Clevert scheduled a consolidated sentencing hearing for the defendant and Terry and Cubie for August 22, 2008. Dkt. No. 508. But when the parties appeared for sentencing, the defendant and Cubie objected to the presentence writer's recommendation that they receive guidelines enhancements for victim Earl Benion's death in relation to the conduct underlying Count Two—the September 2002 discharge of a firearm. Terry stood silent on the issue of Benion's death but asked to proceed to sentencing that day, as scheduled. Id. Judge Clevert adjourned the sentencing hearings for the defendant and Cubie, id. at 2, but went ahead with Terry's sentencing. Judge Clevert overruled Terry's objection to the use of the second-degree murder guideline to set Terry's base offense level, dkt. no. 839-1 at 1, and concluded that Terry had an adjusted offense level of 35 in criminal history category IV, which yielded a sentencing range of 235 to 293 months. Id. Judge Clevert sentenced Terry to serve 260 months (twenty-one years and eight months) in custody followed by five years of supervised release. Dkt. Nos. 557, 558.

Two months after Terry's sentencing, Judge Clevert sentenced co-defendant Cubie. Dkt. No. 572 (minutes), Dkt. No. 579 (judgment). Cubie received 235 months on the drug conspiracy charge and sixty months consecutive on the gun charge, for a total sentence of 295 months (twenty-four years and seven months). Id. at 1, Dkt. No. 579. Judge Clevert observed that the government was not asking the court to enhance Cubie's sentence based on Benion's death and specifically stated that he had not enhanced Cubie's sentence based on Benion's death. Dkt. No. 657 at 23.

The defendant went a different route. In November 2008, he moved to withdraw his guilty plea. Dkt. No. 578. The motion explained that the defendant had believed that he was pleading to a conspiracy that started in 2004 and ended in 2005. Id. He cited a mistake in the plea agreement; he asserted that the document said that he had agreed to plead guilty to Count One of the *third* superseding indictment but that the agreement had listed that conspiracy count as spanning the temporal scope (2004-2005) described in previous versions of the indictment (rather than a scope starting in 2002, as alleged in the third superseding indictment). The defendant stated:

> The difference, according to [the defendant], is a deal-breaker. Had he known that the government expected him to admit that this conspiracy existed as early as 2002 he would not have pleaded guilty. As [the defendant] argued at the hearing on his motion to dismiss the third superseding indictment, he lived in Florida for most of 2002, 2003, and 2004.

Id. at 9. Judge Clevert granted the defendant's motion and allowed him to withdraw his plea. Dkt. No. 586.

B. 2009 Trial

The defendant's jury trial on Counts One, Two and Nine of the third superseding indictment commenced on June 23, 2009.

The following factual recitation of the trial comes from the Seventh Circuit's decision on the defendant's direct appeal.

> The trial consisted of two main components: the drug trafficking conspiracy and the Benion homicide. [The defendant's] arguments on appeal only concern the latter. To briefly summarize the former, the evidence showed that, from 2002 to 2005, [the defendant], Cubie, Terry, and others were involved in procuring large quantities of cocaine, crack, and marijuana from Chicago sources for distribution in Milwaukee, Wisconsin. In general, [the

defendant] and Cubie would obtain the drugs and provide Terry with a supply to sell. The conspirators used an apartment in a duplex owned by [the defendant's] great-uncle, Robert Bridges, and his wife for drug trafficking. At times, Bridges also assisted with drug sales.

The evidence of the homicide showed that, on September 18, 2002, Benion's son, Sirus (age twelve at the time), saw [the defendant] and Terry repeatedly drive by his home in a silver Monte Carlo with Illinois plates, while his father was outside. At one point, [the defendant] blew Benion a kiss. Terry shot Benion that night, and Benion died the next day.

Immediately after the shooting, Terry, Cubie, [the defendant], [the defendant's] father, and Bridges all met in Bridges' apartment. ([The defendant] had previously told Bridges, during a meeting with Terry and Cubie, that they intended to hurt Benion if he did not pay a drug debt.) Over [the defendant's] hearsay and confrontation objections, Bridges testified that Terry then confessed to shooting Benion because of the debt owed to Cubie, [the defendant], and Terry. [The defendant] was quiet during the meeting. But later, when Benion's obituary appeared in the newspaper, [the defendant] told Bridges that Benion "should have paid us our money."

Later that month, Terry got rid of the murder weapon by selling it to Frederick Bonds. (Bonds, a drug dealer by trade, had previously seen Terry with the same gun and had learned from Terry that Benion owed money to [the defendant].) Terry told Bonds that he (Terry) needed to get rid of the gun because it was "hot." Over [the defendant's] hearsay and confrontation objections, Bonds testified that Terry said that [the defendant] and he went looking for Benion, there was an argument over money, and he (Terry) shot Benion. The gun was later recovered from Bonds and traced to the homicide.

Terry also confessed to Darin Palmer, a childhood friend who worked drug houses with Terry. In the fall of 2003, Palmer learned that Terry's drug source was [the defendant]. Over [the defendant's] hearsay and confrontation objections, Palmer testified that, about a year later, while in a drug house, Terry said that he killed Benion over a drug debt and had been compensated for the shooting.

Milwaukee police detective Chad Wagner investigated the Benion homicide. Wagner eventually contacted Avis Rent–A–Car after learning of a vehicle that he "believe[d]" was linked to the homicide. Over [the defendant's] hearsay objection (he later objected to similar testimony on confrontation grounds as well), Wagner

> testified that an Avis employee told him that, on August 18, 2002, Melissa Zaragoza rented a silver Monte Carlo with Illinois plates.
>
> Officers followed up with Zaragoza, who admitted to knowing [the defendant's] wife, [the defendant], Benion, and Terry but denied renting the car in question. Eventually, the car was found, but it yielded no evidence regarding the murder or [the defendant].
>
> Prior to his trial, [the defendant] was detained for several months with inmate Trenton Gray. [The defendant] eventually told Gray that Terry had been involved in the Benion shooting. [The defendant] further explained that Terry and he had gone to collect a drug debt from Benion, when Terry shot and killed him.

United States v. Nicksion, 628 F.3d 368, 372–73 (7th Cir. 2010).

After nine days of trial, the jury found the defendant guilty on all counts—the drug conspiracy, the knowing discharge of a firearm during and in relation to a drug trafficking offense (concerning the September 2002 homicide) and for being a prohibited person in possession of a firearm. Dkt. No. 611 (verdict form). As to the conspiracy count, the jury found the offense involved more than five kilograms of cocaine, fifty grams or more of a mixture or substance containing crack cocaine and marijuana. Id. at 1-2; Dkt. No. 611 (special verdict).

C. October 2009 sentencing

Judge Clevert sentenced the defendant on October 9, 2009. Dkt. Nos. 623 (minutes), 656 (sentencing transcript). The defendant's PSR writer observed that the drug amounts in the defendant's Count One offense (at least fifty kilograms, but less than 150 kilograms, of cocaine) would yield a base offense level of 36. Dkt. No. 848-1 at ¶155. But the PSR writer recommended that the court use a base offense level of 38 for Count One, citing U.S.S.G.

§2D1.1(d). Dkt. No. 848-1 at ¶155. The PSR writer observed that U.S.S.G. §2D1.1(d) stated that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 111[1] had such killing taken place within the territorial or maritime jurisdiction of the United States," the court should apply either §2A1.1 (First Degree Murder) or §2A1.2 (Second Degree Murder), if the resulting offense level would be greater than that determined under the guideline. Id.

The author of the PSR wrote:

> In this instance, the evidence indicates Mr. Terry committed the murder of Earl Benion in 2002 as part of the conspiracy, and [the defendant] was present. Information from witnesses and the victim, indicate Mr. Terry shot Mr. Benion in the left buttock or hip area in an attempt to recover $20,000.00 in drug money owed to Mr. Terry and [the defendant]. Though it appears Mr. Terry and the defendant planned to use a weapon to convince Mr. Benion to pay the money he owed them, it does not appear this was premeditated. Mr. Terry shot Mr. Benion in the hip area which caused an injury, initially repaired by doctors, but the victim later died due to the internal bleeding. Additionally, Mr. Terry and [the defendant] were interested in recouping the money they were owed which would have been undermined by an intentional homicide. Therefore, the base offense level in this case is found in U.S.S.G. § 2A1.2(a) and has a base offense level of 38.

Id.

The PSR also recommended a four-level enhancement for the defendant's role in the offense as a leader or organizer, to arrive at a proposed total offense level of 42. Id. at ¶¶158, 160.

The defendant did not object to a base offense level of 38 for Count One—either before the sentencing hearing or during it. Dkt. No. 617 (defendant's objections to PSR); Dkt. No. 656 (sentencing transcript). The defendant *did*

object to the four-level enhancement for his role in the offense and offered additional remarks at sentencing. Dkt. No. 617 at 1, Dkt. No. 656 at 5-6, 10. Judge Clevert overruled that objection, citing specific paragraphs of the PSR that supported his ruling Id. at 17-20 (citing PSR ¶¶15, 17, 24, 25, 26, 57, 64, 65, 78, 96, 97, 128, 129, 132, 136, 137, and 141). The defendant also objected to paragraph 174, which assessed a criminal history point for the defendant's 1996 operating-after-revocation conviction. Id. at 1. Judge Clevert sustained that objection, dkt. no. 656 at 15 and found the defendant's criminal history category to be II, id. at 21.

As for Count Two, the PSR calculated that the guideline for a violation of 18 U.S.C. §924(c) was U.S.S.G. §2K2.4(b), which provided that the guideline sentence for a violation of that statue was the minimum term of imprisonment required by statute. PSR ¶161. In the defendant's case, 18 U.S.C. §924(c)(1)(A)(iii) required a mandatory minimum sentence of ten years, because the defendant had been charged with, and convicted of, discharging a firearm during and in relation to the drug conspiracy. Id. The defendant did not object to this calculation. Dkt. Nos. 617, 656.

As for Count Nine, the PSR calculated a base offense level of 20 under U.S.S.G. §2K2.1(a)(4)(A). PSR ¶162. The PSR recommended adding four levels for possession of a firearm in connection with another felony offense under U.S.S.G. §2K2.1(a)(4)(A), id. at ¶163, for an adjusted offense level of 24. ¶167. The defendant did not object. Dkt. No. 617, Dkt. No. 656. Finally, the PSR concluded that Counts One and Nine would group under U.S.S.G. §3D1.2(c),

"because Count One embodies conduct which is treated as a specific offense characteristic in Count Nine." PSR at ¶168. Id. The defendant did not object to the grouping determination at sentencing. Dkt. Nos. 617, 656.

After overruling the defendant's objection to the role enhancement and sustaining his objection to the criminal history point, Judge Clevert found the defendant's total offense level to be 42. Dkt. No. 656 at 21. Judge Clevert concluded that an offense level of 42 in criminal history category II resulted in an advisory guideline range of 360 months (thirty years) to life imprisonment.

Judge Clevert imposed a sentence of 360 months' imprisonment on Count One, 120 months' imprisonment on Count Two and 120 months' imprisonment on Count Nine, with the sentences imposed on Counts Two and Nine to run concurrently with each other but consecutively to Count One,[2] for a total term of 480 months' (forty years') imprisonment. Dkt. No. 627.

D. Appeal and Post-conviction proceedings

On direct appeal, the defendant argued that "his confrontation clause rights were violated at trial when the district judge admitted out-of-court statements implicating [the defendant] in the homicide of Earl Benion, which was used to prove the firearm offense under § 924." Nickson, 628 F.3d at 672. The Seventh Circuit found that any error in the admission of the statements "was clearly harmless" and dismissed the defendant's appeal. Id. at 375. On

[2] The charge in Count Two—a violation of 18 U.S.C. §924(c)—required the court to impose the sentence for that count "in addition to"—consecutive to—the sentence imposed on any other charge. 18 U.S.C. §924(c)(1)(A)(iii).

appeal, the defendant did not raise any issues regarding Judge Clevert's guideline calculations or the sentence Judge Clevert imposed.

On March 13, 2012, the defendant filed a motion under 28 U.S.C. §2255 to vacate his conviction. Dkt. No. 701 (opened as Case No. 12-cv-240). As Judge Clevert recounted in his January 2015 order denying the motion, the defendant raised eleven grounds for relief, ten of which were "predicated on [the defendant's] belief that his trial and appellate counsel were ineffective in their representation." Nicksion v. United States, Case No. 12-cv-240-CNC, 2015 WL 402811, at *2 (E.D. Wis. Jan. 28, 2015). Judge Clevert observed that two of the defendant's §2255 arguments pertained specifically to sentencing—first, that his counsel should have objected to the base offense level for Count One because the jury did not make a drug quantity finding,[3] and second, that his counsel did not adequately object to the enhancement for the defendant's role in the offense. Id. at *3. Judge Clevert rejected these arguments, finding that the defendant's base offense level of 38 was "because of his role in the homicide of Earl Benion" and that the record contained ample support for the court to find the leader/organizer enhancement appropriate. Id. The Seventh Circuit found no substantial showing of the denial of a constitutional right and

---

[3] Although Judge Clevert did not base his decision on this fact, the jury *did* make a drug quantity finding. The special verdict form asked whether the conspiracy charge involved five kilograms or more of a mixture or substance containing cocaine; the jury answered "yes." Dkt. No. 611 at 1. The special verdict form also asked whether the offense involved fifty grams or more of a mixture or substance containing crack; again, the jury answered "yes." Id. at 2.

denied the defendant's request for a certificate of appealability. Nicksion, Case No. 12-cv-240-CNC (E.D. Wis.), Dkt. No. 24 at 3.

On December 8, 2014, the defendant filed a motion for modification of his sentence, citing 18 U.S.C. §3582(c) and U.S.S.G. Amendment 782. Dkt. No. 752. In this motion, the defendant argued that his base offense level should have been reduced from level 38 to level 36 under Amendment 782. Id. The defendant argued that, if applied, that amendment would reduce his advisory sentencing range from 360 months to 288 months. Id.

Judge Clevert retired in March 2015, and the case was reassigned to this court. Dkt. No. 752. On March 18, 2016, after receiving input from the Federal Defender Service of Wisconsin, dkt. no. 778, and from the government, dkt. no. 795, the court denied the defendant's motion, dkt. no. 796.[4]

## II. Defendant's Motion To Reduce Sentence (Dkt. No. 846)

On February 14, 2024—almost eight years after this court denied the defendant's Rule 782 reduction motion, and two and a half years ago—the defendant filed a "Motion for Sentence Reduction Pursuant to § 404 of the First Step Act." Dkt. No. 846. After describing his imposed sentence, the defendant argued in a section called "Relevant Facts" that the court had erred in applying a murder cross reference provision. Id. He said that "[t]he murder cross reference provision in United States Sentencing Guidelines Manual forbid

[4] Because the defendant's offense level of 38 was based on his role in the Benion homicide, and not on the amount of drugs involved in the conspiracy, the Amendment 782 reduction did not result in a reduction of the defendant's base offense level.

treating relevant conduct for murder if the murder was unrelated and was uncharged especially if used to be grouped together with other offenses." Id. at 3. The defendant argued that this error now could be corrected based on current law and developments since his sentencing. Id.

The defendant contended that the court must follow United States v. Shaw, 734 F.3d 738 (7th Cir. 2020) which, he said, "held that if a defendant was convicted of a crack cocaine offense that was later modified by the Fair Sentencing Act of 2010 he or she is eligible to have a court considered [sic] whether a reduction of the previously imposed term of imprisonment" is warranted. Id. at 4. The defendant said that Shaw guides the district court to look at new statutory maximum or minimum penalties, current guidelines, post-sentencing conduct and "other relevant information about defendants' history and conduct." Id. The defendant argued that his offense—the Count One drug conspiracy—is a "covered offense." Id. at 5. He argued that at the time he filed the motion (in February 2024), his statutory mandatory minimum would be five years, with a mandatory maximum sentence of forty years. Id.

The defendant cited an unpublished opinion from the Fourth Circuit Court of Appeals, United States v. Sellers, Nos. 10-4701, 10-4702, 10-4917, [512 F. App'x. 319] (4th Cir. 2013), which, he said, held that the district court had committed procedural error in treating a murder as relevant conduct to the underlying conspiracy. Id. at 6. The defendant also cited United States v. Herrera, 70 F.3d 444 (7th Cir. 1997), United States v. Hill, 372 F. App'x 675 (7th Cir. 2010) and United States v. Tello, 687 F.3d 785 (7th Cir. 2012) as

standing for the proposition that "the murder [c]ross-reference cannot be grouped with other counts to substantiate the overall sentence." Id.

In the defendant's "argument" section, he asserted that his 360-month sentence[5] was "significantly longer" than the average sentence a similarly situated defendant would receive today. Id. at 7 (citing 18 U.S.C. §3553(a)(6)).[6] The defendant argued that "without the murder cross-reference" and "since the drug quantity was not correctly added under USSG §2D1.1," the sentencing court would have had to use the indictment's alleged quantities for his sentence. Id. He said that the indictment amount—fifty grams of cocaine—would result in a base offense level of 24 under U.S.S.G. drug quantity table §2D1.1(b). Id. He calculated that his guideline range would be sixty-three to seventy-eight months' imprisonment. Id. The defendant reiterated that he should receive a reduction because "the murder cross-reference guidelines was an ungroupable offense and was used to enhance[] [his] sentence[.]" Id. at 8.

At the end of his motion, the defendant explained that he is now fifty-two years old and that, as of 2024, he was not due to be released for another seventeen years. Id. at 9. The defendant said that he had shown "extraordinary" rehabilitation efforts as evidenced by his certification of course

---

[5] Judge Clevert sentenced the defendant to serve 480 months (forty years), not 360 months (thirty years). Dkt. No. 627.

[6] Section 3553(a)(6) requires courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" when fashioning a defendant's sentence.

completions that he attached to the motion. Id. He asked the court to reduce his sentence to time served.

A. Government Response

On March 1, 2024, the government filed a response to the defendant's motion. Dkt. No. 849. After recounting the bases for Judge Clevert's sentence, Id. at 1-2, the government conceded that the defendant is "eligible for relief because he was convicted of Conspiracy to Distribute 50 grams or more of crack cocaine and the penalties for this offense under the First Step Act were reduced from a mandatory minimum of 10 years to life to a mandatory minimum of 5 to 40 years imprisonment." Id. at 3.

But the government contended that the court should exercise its discretion and decline to reduce the defendant's sentence. Id. It argued that although today, the defendant's mandatory minimum penalty on Count One would be less than the ten years applicable when Judge Clevert sentenced him in 2009, the defendant's guideline range would remain the same (360 months to life). The government contended that the defendant's argument that the Benion murder should not have affected his guidelines was hollow and asserted that the murder was not "uncharged relevant conduct," it was *charged* conduct—specifically charged in Counts One and Two—for which the jury found the defendant guilty. Id. at 7. The government argued that at trial, it proved that the drug conspiracy included a murder and so the application of U.S.S.G. §2A1.2, through U.S.S.G §2D1.1(d), was appropriate. Id.

More generally, the government contended that the §3553(a) factors weigh against any reduction. It recounted the defendant's violent history, including the fact that, before his involvement in the drug conspiracy, the defendant had been convicted of false imprisonment and battery while armed with a dangerous weapon. The government said that the false imprisonment and battery conviction was the result of the defendant attempting to collect a drug debt, and it reminded the court that the Benion murder was another attempt to collect a drug debt. Finally, it advised the court that in 2005, the defendant had threatened violence against another victim (Ms. Jan Long) regarding collection on a drug debt, but that he was arrested before "he and his cohorts acted" on that threat. Id.

The government argued that the seriousness of the offense and the need to protect the community outweigh any efforts the defendant has made at rehabilitation. Id. at 8. The government asked that if the court considers re-sentencing the defendant, it hold a new sentencing hearing so that the Benion family members can be contacted and offered the opportunity to provide input. Id.

B. Probation Office's Response (Dkt. No. 848)

The court also requested input from the Probation Office. That office provided an update on February 28, 2024. Dkt. No. 848. The update confirmed that since the defendant's sentencing, the statutory penalties for Count One (the drug conspiracy) had been reduced to a mandatory minimum of five years and a maximum of forty years in prison; it explained that the statutory

penalties for Counts Two (the §924(c) count) and Nine (the prohibited person in possession of a firearm count) had not changed. Id. at 2. The update concluded that despite the change in the mandatory minimum trigger amount for crack, the defendant's total offense level had not changed; in other words, probation calculated that the original PSR writer correctly had cross-referenced U.S.S.G. §2A1.2 in calculating the defendant's total offense level of 38. Id. The update opined that the Seventh Circuit cases the defendant had cited (Herrera, Hill and Tello) did not appear to affect the court's sentencing findings.

The probation office concluded that the defendant's guideline range remained 360 months to life imprisonment on Counts One and Nine, and that Count Two still carried a sentence of 120 months' imprisonment, in addition to any other sentence. Id. The update recounted that the defendant had (as of February 2024) received three disciplinary violations from the Bureau of Prisons and, as a result, had lost a total of fifty-one days of good time credit. The update advised that the defendant had completed programming on "African American History," "Challenge to Change" and "AIDS Awareness (2)" and had completed 240 hours of literacy orientation. Id. at 3. It reflected that the defendant had a scheduled release date of September 12, 2040. Id.

A current review of the Bureau of Prisons' inmate locator reveals that the defendant currently is confined at Miami Federal Correction Institution. BOP Inmate Locator, available at: https://www.bop.gov/inmateloc/ (last visited August 18, 2026). His projected release date has not changed. Id.

C. Defendant's Reply (Dkt. No. 856)

At the defendant's request, the court extended his time to file his reply brief until July 19, 2024. Dkt. No. 853.[7]

In his reply, the defendant reiterated his eligibility for a reduction under Section 404(b) of the First Step Act for his conviction under 21 U.S.C. §841(b)(1)(B). The defendant argued that in determining whether to exercise its discretion on a sentence reduction, the court "may consider intervening change[s] of law or fact in reaching its decision." Id. at 2 (citing Concepcion v. United States, 597 U.S. 481, 500 (2022)).

The defendant repeated his belief that Judge Clevert erred in applying U.S.S.G. §2D1.1(d)(1) because, the defendant asserts, the Benion murder was not relevant conduct to the defendant's offense of conviction. Id. He argues "there was no evidence that the Benion's [sic] murder occurred during, in preparation for, or in the course of attempting to avoid detection for a cocaine/crack cocaine conspiracy of which [the defendant] was convicted." Id. at 2. The defendant again argued that the Benion murder cannot be considered relevant conduct because "3D1.2(d) provides that murder cannot be grouped with other crimes." Id. The defendant's reply contended that the government has "the wrong picture" of the defendant in these proceedings; he asserted that

[7] The court issued conflicting text-only orders about the deadline for the defendant to file his reply brief. Compare Dkt. No. 853 (setting deadline for July 19, 2024) with Dkt. No. 855 (setting a deadline of June 7, 2024). Because the defendant's July 2 reply was timely filed under the court's original deadline (July 19, 2024), the court has considered the reply in deciding his motion for sentence reduction.

his co-defendant Ronald Terry was the triggerman in the Benion murder and that Terry since has been released on federal supervised release. Id. at 4.

The defendant no longer contends that his guidelines calculation should be 63 to 78 months (as he argued in his original motion); instead, he calculates that it should be 262 to 327 months "based on the drug amount found in the PSI that was not used during the original sentencing." Id. The defendant concluded by arguing that the time he already has served in prison reflects the seriousness of his offense and satisfies the need for general and specific deterrence as well as respect for the law and just punishment. Id. at 7.

## III. Analysis

### A. Legal Framework

The Fair Sentencing Act of 2010 "increase[ed] the quantity of crack cocaine required to trigger the minimum ten-year sentence from 50 grams to 280 grams;" §404 of the First Step Act of 2018 made the Fair Sentencing Act of 2010 retroactive to offenses committed prior to 2010. United States v. Clay, 50 F.4th 608, 610 (7th Cir. 2022). "Section 404(b) of the First Step Act allowed defendants convicted of 'covered offenses' to file motions requesting that their sentencing courts impose reduced sentences 'as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." Id. (citation modified). A "covered offense" is a "violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010[.]" Pub. L. No. 115-391, §404(b), 132 Stat. at 5222.

A court's first step in deciding a motion under §404(b) is to determine whether the defendant is eligible for relief; in other words, it must determine whether the defendant has been convicted of a "covered offense." Clay, 50 F.4th at 611. At trial, the jury found the defendant guilty of a drug distribution conspiracy under 21 U.S.C. §§841(b)(1)(A) and 846 which involved fifty grams or more of crack. See Dkt. No. 611. From the 2002 start of the drug conspiracy through his October 2009 sentencing hearing, a conviction under 21 U.S.C. §841(b)(1)(A) carried a ten-year mandatory minimum sentence for a conspiracy that involved five kilograms or more of powder cocaine and/or fifty grams or more of crack. The Fair Sentencing Act changed part of that mandatory minimum by requiring a defendant to possess at least 280 grams of crack to trigger a ten-year mandatory minimum sentence; now, a defendant convicted of a conspiracy involving fifty grams or more of crack faces only a five-year mandatory minimum. 21 U.S.C. §841(b)(1)(A)(iii).[8] The government agrees that the defendant is eligible for relief, and the Seventh Circuit has said a conspiracy conviction under 21 U.S.C. §§841(b)(1)(A) and 846 qualifies as a covered offense. In addition, this court has found the defendant's co-

---

[8] Although the First Step Act changed the mandatory minimum for *cocaine base/crack*, it did not change the mandatory minimum sentence for powder cocaine. Under §841(b), the mandatory minimum sentence for drug offenses involving five or more kilograms of *powder* cocaine remains ten years. The jury specifically found that the defendant's offense involved five or more kilograms of powder cocaine. One might think that this fact would make the defendant ineligible for First Step Act relief. But in United States v. McSwain, 25 F.4th 533, 538-39 (7th Cir. 2022), the court "accepted the government's concession" that in multi-substance cases, conspiracy to traffic cocaine is a "covered offense" "even if another object of the conspiracy triggered the same statutory penalty range." (quoting Terry v. United States, 593 U.S. 486 (2021)).

defendants—who pled guilty to the same conspiracy—to be eligible for relief. The defendant is eligible, because he has been convicted of a "covered" offense.

The court next must decide whether to exercise its discretion to reduce the defendant's sentence. At this stage, "the First Step Act "'leaves much . . . to the judge's own professional judgment[.]'"" Concepcion, 597 U.S. at 501 (citation omitted). "The only limitations on a court's discretion to consider any relevant materials at an initial sentencing or in modifying that sentence are those set forth by Congress in a statute or by the Constitution." Id. at 494. "Congress in the First Step Act simply did not contravene this well-established sentencing practice. Nothing in the text and structure of the First Step Act expressly, or even implicitly, overcomes the established tradition of district courts' sentencing discretion." Id. at 495.

> It follows, under the Court's sentencing jurisprudence, that when deciding a First Step Act motion, district courts bear the standard obligation to explain their decisions and demonstrate that they considered the parties' arguments. It is well established that a district court must generally consider the parties' nonfrivolous arguments before it.

Id. at 500-01.

The Seventh Circuit requires district courts to "begin by recalculating the statutory minimum and maximum that would have applied at §§ 2 and 3 of the Fair Sentencing Act been in effect at the time the movant was originally convicted." United States v. Fowowe, 1 F.4th 522, 529 (7th Cir. 2021). "Not considering the lower statutory penalties now applicable to a defendant's offense of conviction is procedural error." Id. (citation modified). Next, the court must "consider a plethora of factors, including (among others) the nature of the

crime, characteristics of the defendant, the needs of the community and victim, as well as the Sentencing Guidelines and policy statements issued by the Sentencing Commission." Id. (citing 18 U.S.C. §3553(a)). And if there is an intervening court decision, "the First Step Act authorizes but does not require a district court to apply intervening judicial decisions." Id. at 531-32.

B. Application

So—as the Seventh Circuit stated in Fowowe, this court first must recalculate the defendant's minimum and maximum statutory penalties. The jury found that the defendant's conspiracy charge involved five kilograms or more of a mixture and substance containing cocaine. Dkt. No. 611 at 1. Between Carl McAfee and Ernest Hinkles alone (both of whom admitted that they bought kilogram-amounts of cocaine from the defendant), the government's evidence showed that the defendant sold at least forty-one kilograms of cocaine. Adding amounts discussed, amounts sold and possessed by other co-conspirators and valuable items found on the defendant at the time of his arrest, the government demonstrated by a preponderance of the evidence that the defendant was involved in a conspiracy that involved fifty or more kilograms of cocaine. Under today's sentencing guidelines (the 2025 Guidelines Manual), that would make his base offense level 34 under §2D1.1(c)(3).

But U.S.S.G. §2D1l1(d)(1) contains a cross-reference that says:

> If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.1(2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined above.

The defendant's principal argument for resentencing is a contention that Judge Clevert erred in applying this cross-reference. He asserts that the cross-reference "will only be applicable if Benion's murder is relevant to [the defendant's] offense of conviction under guideline § 1B1.3," and he cites §2D1.1(d)(1) for that proposition. Dkt. No. 856 at 2. He maintains that there was no evidence that Benion's murder occurred "during, in preparation for, or in the course of attempting to avoid detention for a cocaine/crack cocaine conspiracy of which [the defendant] was convicted." Id. He asserts that even if such evidence existed, the murder would constitute relevant conduct under §1B1.3(a)(2) only if §3D1.2(d) required grouping; he says that that guideline "provides that murder cannot be grouped with other crimes." Id. at 3. Finally, the defendant argues that the government has the facts wrong—he asserts that it was Ronald Terry who pulled the trigger and shot Benion, and he asserts that it isn't fair that Terry now is out of custody and he—who did not pull the trigger—remains incarcerated. Id. at 3-4.

There are several problems with the defendant's guidelines argument. First, he did not raise this argument to Judge Clevert in his pre-sentencing objections to the PSR or at his sentencing. He did not raise this argument to the Seventh Circuit on his direct appeal and did not raise it to Judge Clevert in his §2255 petition. He raises for the first time in a First Step Act motion filed fifteen years after his sentencing. And although the defendant is correct that a court conducting a First Step Act resentencing may consider nonretroactive guidelines amendments to help inform whether to reduce a sentence,

Concepcion, 597 U.S. at 499, the defendant is not arguing that the *guidelines* Judge Clevert applied have changed (retroactively or non-retroactively). Rather, he argues that Judge Clevert improperly applied the guidelines (which have not changed). This court has court has found no First Step Act resentencing cases that rely on "correcting" previously unidentified errors in the sentencing guidelines calculations to justify resentencing. But see United States v. Mitchell, Appeal No. 23-3403, 2024 WL 3534147, at *2 (7th Cir. July 25, 2024) (declining to resentence defendant under the First Step Act by noting that current law still permits the application of the murder cross-reference based on judge-made findings by a preponderance of the evidence)

Second, even if a sentencing error could justify a sentence modification, Judge Clevert did not err in calculating the base offense level for Count One. U.S.S.G. §2D1.1(d) expressly directs a court to apply the base offense level provided in guidelines §2A1.1(a) or (b) where a victim is killed under circumstances that would constitute murder. Contrary to what the defendant believes, §2D1.1(d) does not mention relevant conduct, nor does it reference the relevant conduct guideline (§1B1.3). Nor does the grouping guideline in §3D1.2 have anything to do with the defendant's guideline calculation. Section 2D1.1(d) is a stand-alone sentencing enhancement that applies in cases in which a victim is killed under circumstances that would constitute murder. So the question is whether the government proved by a preponderance of the evidence that a victim was killed under circumstances that would constitute (in this case) second-degree murder. Section 1111 of Title 18 of the United States

Code defines second degree murder as any murder that does not involve malice aforethought.

Count One of the third superseding indictment alleged that "[b]eginning "sometime in 2002 and continuing through May 16, 2005," the defendant conspired with Mark Cubie, Ronald Terry, Delano Hill, Jose Lopez, Donald Buchanan and others known and unknown to the grand jury to distribute controlled substances. Dkt. No. 419 at 1. After the defendant put the government to its proof at trial, a jury found the defendant guilty of that charge. Dkt. No. 611 at 1. So the jury convicted the defendant of participating in a drug conspiracy that started sometime in 2002.

The PSR recounts the government's evidence relating to the Benion murder:

> On 9/19/02, Rodney Herron was upstairs in his bedroom watching television when he heard the sound of a gunshot outside. Mr. Herron lived on the east side of the 5800 block of North 74th Street. He immediately looked outside and saw the victim fall to the ground. Near the victim, he saw a gray or silver two door Monte Carlo which had 20 inch tires and six point star mag rims. Two men were outside the car and one of the men was kneeling by the victim as if he was talking to him. Mr. Herron could hear the victim yelling "call 911." Mr. Herron then saw the two suspects get into the vehicle, which was facing northbound, drive into an alley, back out, and drive back southbound. The vehicle stopped by the victim briefly, and then continued south on North 74th Street. While this was occurring, Mr. Herron was yelling at his mother, Sheila Herron, to call 911. Ms. Herron also looked out of the window and saw a gray or silver auto across the street against the curb and called 911.
>
> In response to the 911 call, Milwaukee Fire Department Engine 8 was the first to arrive at the scene at approximately 12:17 a.m. The firefighters discovered the victim, Earl Benion, lying in the street with a single gunshot wound to the left hip area. A firefighter who was attending the victim states he heard the victim say person by

the name of "Von" had shot him, and a second person by the name of "Orlando" was with Von.

Dkt. No. 848-1 at ¶¶76-77.

Benion was able to give paramedics a telephone number for "Orlando." Id. at ¶78. Benion told the police officer who rode with him in the ambulance that Von and Orlando had shot him and that they were in a Monte Carlo; he gave the officer Orlando's cell number (406-5768). Id. at ¶79. Benion underwent surgery, but died at 9:43 a.m. on September 19, 2002 as a result of complications from the gunshot wound. Id. at ¶¶80-81.

Officers learned from Benion's uncle that Benion had a friend known as Lando, who had a cousin named Von; the uncle believed that "Lando" was the defendant. The uncle reported that on September 17, 2002, he'd seen the defendant driving a gray, two-door Monte Carlo. Id. at ¶85. The phone number Benion had provided firefighters and police was registered to a Melissa Zaragoza, who on August 18, 2002 had rented a 2002 Monte Carlo and returned it at 3:33 p.m. on September 19, 2002. Id. at ¶87. Through Ms. Zaragoza, however, the officers learned that the car (and others) had been rented by the defendant's girlfriend/wife, Cristela Gonzales-Nicksion. Id. at ¶¶93-94.

In August 2006 and January 2007, agents interviewed Trenton Gray, who had been in custody with the defendant. Gray told the agents that the defendant had made statements to Gray about the Benion homicide, saying that "someone" had owed the defendant money and that the defendant had gotten Terry and gone looking for that person. The defendant said that he'd

simply wanted to scare the person, but that Terry had ended up shooting him. The defendant said that Terry had given the gun used in the shooting to one of his guys, who got caught with it. Id. at ¶25. On November 10, 2002, Frederick Bonds was arrested by the Milwaukee police after a foot chase; police found a .45 handgun in the location where he was arrested. Bonds told police he'd bought the gun two weeks earlier from a drug dealer named "Jerry." Id. at ¶88.

In November 2025, agents interviewed Wayne Rodgers, who said Ronald Terry had told him that Terry had started fronting cocaine to the defendant because Terry had killed someone for the defendant over a drug debt owed to the defendant; Rodgers said Terry had admitted to killing the person for the defendant. Id. at ¶130.

On February 9, 2006, agents interviewed Robert Bridges. Among other things, Bridges told agents the following:

> Mr. Bridges said a couple of months after [Mark] Cubie and [the defendant] began using the upper residence as a drug house, he was upstairs hanging out with [the defendant] and Mr. Cubie. [The defendant] and Mr. Cubie were complaining about a person known to Mr. Bridges as "Hammer" (Earl Benion). They had given "Hammer" $20,000.00 worth of cocaine and Hammer had not yet paid them. [The defendant] and Mr. Cubie said they were going to turn the matter over to Mr. Terry to collect the debt.
>
> About one week later, Mr. Bridges was called upstairs by [the defendant] about 10:30 p.m. [The defendant], Mr. Cubie and Mr. Terry were present. Mr. Terry told Mr. Bridges he shot the guy who owed them $20,000.00. Mr. Terry, [the defendant], and Mr. Cubie then told Mr. Bridges how they waited outside the guy's apartment until the guy came out and all three talked about the incident. Mr. Terry and [the defendant] were in [the defendant's] car and Mr. Cubie was in his own car. When "Hammer" came out of the apartment, Mr. Terry jumped out of the car, approached him, asked where the money was at, and then shot Hammer in the buttocks. "Hammer" fell to the side of the road and as Mr. Terry and [the

> defendant] drove off, "Hammer" asked them to call an ambulance. Mr. Bridges stated [the defendant's] father "Rudy" was also present in the upper residence when the shooting was being discussed. They then asked Mr. Bridges to get rid of the clothing Mr. Terry wore during the shooting, but he refused and went back downstairs. He then told Jan Long what he had heard upstairs.
>
> A few days later, [the defendant] called Mr. Bridges and said the guy Mr. Terry shot had died. Mr. Bridges then confirmed the death by reading a newspaper.

Id. at ¶¶136-138.

These facts prove, by a preponderance of the evidence, that the stand-alone enhancement under §2D1.1(d)(1) for the killing of a victim that would have constituted second-degree murder was warranted and appropriate. The defendant's arguments ignore these facts. He does not acknowledge the fact that the government proved, and the jury found, that the Count One drug distribution conspiracy spanned from sometime in *2002* through May of 2005; he does not acknowledge the fact that the government proved that, in September 2002, the defendant's co-defendant/co-conspirator/accomplice discharged a firearm in relation to that drug trafficking offense; and he does not acknowledge any culpability for Benion's death.

The defendant appears to continue to maintain his pretrial position (evidenced by his admissions in his plea agreement and his motion to withdraw his plea) that he was involved in a drug distribution conspiracy in 2004 and 2005, but not in 2002. The jury found otherwise, and its verdict survived the defendant's appeal and post-trial motions. And Judge Clevert made clear—both at sentencing and in his ruling on the defendant's §2255 petition, that he was not calculating the defendant's base offense level using the amount of drugs,

but "because of [the defendant's] role in the homicide of Earl Benion." Nicksion, Case No. 12-cv-240, Dkt. No. 14 at 5-6. Indeed, Judge Clevert did not make any findings regarding the drug quantity, because he was not calculating the base offense level based on the drug quantity. Id.

The defendant also argues that the court ought to reduce his sentence because he was not the person who pulled the trigger and killed Earl Benion, and the person who did pull the trigger now is out of custody. But the evidence supports the conclusion that both Terry and the defendant decided to collect the drug debt from Benion. It supports the conclusion that the defendant drove Terry to Benion's location in a car rented by the defendant's significant other. It supports the conclusion that the defendant stood by as Terry shot Benion. And it supports the conclusion that the defendant and Terry left Benion lying there, bleeding and calling for help. Terry and the defendant were co-conspirators in obtaining, distributing and collecting money for cocaine. As co-conspirators, they went to Benion's location to collect a drug debt. "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy." United States v. Sandoval-Curiel, 50 F.3d 1389, 1394 (7th Cir. 1995). The jury found that the defendant was a member of a conspiracy that started in 2002; the shooting occurred in the fall of 2002; the killing of someone who owed the defendant and Terry a substantial drug debt was a natural consequence of the conspiracy, and perhaps furthered the conspiracy.

The fact that the defendant did not, himself, pull the trigger does not impact the guidelines calculations.

So even calculating the defendant's guidelines using the 2025 manual, the defendant's base offense level is 38—the same as it was when Judge Clevert calculated it seventeen years ago. The defendant still receives a 4-level enhancement for being a leader or organizer, which puts him at an adjusted offense level of 42. He remains in criminal history category II (as far as the court is aware). He remains in an advisory guideline range of 360 months to life. The only difference is that today, the statutory maximum sentence for Count One is forty years, not life. And forty years is the sentence Judge Clevert gave him—the current statutory maximum, but nonetheless a legal sentence.

Having calculated the defendant's guidelines under the current guidelines manual, the court now turns to the question of whether it should exercise its discretion to reduce the defendant's sentence. As it did when Ronald Terry asked for a sentence reduction, the court concludes that this is not an appropriate case for the court to exercise its discretion, even though the defendant is eligible for a sentence reduction. The court has explained that Judge Clevert did not calculate the defendant's guidelines or his sentencing range based on the amount of drugs attributed to him. Judge Clevert calculated the defendant's guidelines based on proof that the conspiracy had involved the killing of a victim under circumstances that would constitute second-degree murder—an extremely serious offense.

The defendant emphasizes that even without this court granting him a sentence reduction, Terry got a much lower sentence than the defendant did, even though Terry shot Benion. Judge Clevert sentenced Terry to just under twenty-two years—almost half what the defendant received. Under 18 U.S.C. §3553(a), the court must consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Terry certainly was found guilty of similar conduct. But the defendant is not similarly situated with Terry for a couple of reasons. First, Terry pled guilty and accepted responsibility for his actions. The guidelines allow—in fact, encourage—judges to credit defendants who take responsibility for what they have done in fashioning the sentence. Judge Clevert was able to give Terry a lesser sentence because Terry accepted responsibility.

The law also allows the government to negotiate away mandatory minimum sentences through plea agreements. Because the defendant chose (as was his constitutional right) to go to trial, he started out at a mandatory minimum sentence of twenty years—ten for the drug conspiracy and a consecutive ten for the §924(c) charge. Today, he would start at a mandatory minimum of fifteen years—five for the drug conspiracy and a consecutive ten for the §924(c) charge. Because Terry pled guilty, the government allowed him to plead only to the conspiracy charge. He was not required to plead to the §924(c) charge. See Dkt. No. 466 at 3. That means that Terry started out at a mandatory minimum sentence of only ten years—not twenty, like the defendant.

Another significant difference between Terry and the defendant has to do with the defendant's criminal history—something the court is required to consider under 18 U.S.C. §3553(a)(2). The defendant was thirty-one years old at the time of Benion's murder. Not quite ten years earlier, when he was twenty-two, he'd been charged with false imprisonment and battery while armed with a dangerous weapon. Dkt. No. 848-1 at ¶173. The facts recounted in the presentence report reflect that the defendant and Carl McAfee took another person to a location where the defendant threatened him with a gun and beat him to get money the defendant had lost from some drug houses. (Others were involved in this offense; it was not just the defendant and Carl McAfee.) Id. So when Judge Clevert sentenced the defendant, he knew that the defendant had been convicted for another incident involving threatening and harming someone over a drug debt. As it considered whether to reduce the defendant's sentence, this court knew that as well. The defendant also had arrests—admittedly, not convictions—for aggravated use of a weapon and first-degree intentional homicide by use of a dangerous weapon. Those charges were not prosecuted.

Another facet of the history and characteristics of the defendant—which §3553(a) requires the court to consider—is the defendant's attitude toward the offense of conviction. A decade and a half after these events took place, the defendant has expressed no remorse or acceptance of responsibility for his role in a large-scale drug operation (as a leader of that organization) or in the death of another person. The defendant co-ran a significant drug trafficking

organization. He was part of the murder of someone who did not pay his debts to that organization. He has not acknowledged or expressed remorse for those events. He is not similarly situated to Terry or to Cubie, and the circumstances warranted the sentence Judge Clevert imposed.

It does appear that the defendant has been trying to use his time in prison wisely. At the time he filed his motion, he had participated in several programs; he may have participated in more since filing the motion. That can only be good—for the defendant, for the people in custody with him and for the people he will encounter when he is released. It already appears to have helped the defendant—he now is in a low-security institution, which shows that he has achieved a reduction in his security classification over the years. But that is not sufficient to convince the court that it should exercise its discretion to reduce his sentence.

The court is not blind to the serious impact this sentence has had on the defendant's life. He has been in custody now for over twenty-one years. At the time of his sentencing, he had a wife and two children; his children now are adults. He reported having a record label and having made a film; presumably he has had to leave that career behind. He has been incarcerated during the COVID-19 pandemic—a terrifying time for anyone, but especially so for those in custody. The defendant likely has lost friends and family members, lost contact with others. The court would never downplay the seriousness of taking away a person's freedom. But loss of freedom is a consequence of the decisions the defendant has made.

For all of these reasons, the court will deny the defendant's request for a First Step Act sentence reduction.

## IV. Conclusion

The court **DENIES** the defendant's motion for a reduced sentence under the First Step Act of 2018. Dkt. No. 846.

The court **DENIES AS MOOT** the defendant's motion for status update. Dkt. No. 857.

The court **DENIES AS MOOT** the defendant's motion to compel prompt ruling and enforce controlling law under the First Step Act, with notice of due process violation. Dkt. No. 859.

The court **DENIES AS MOOT** the defendant's second motion to compel prompt ruling and enforce controlling law under the First Step Act, with notice of due process violation. Dkt. No. 860.

Dated in Milwaukee, Wisconsin this 26th day of August, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**